UNITED STATES of America, Appellee,

v.

Silvio DeWOLF, Defendant, Appellant.

No. 81–1747.

United States Court of Appeals,
First Circuit.

Argued Sept. 8, 1982.
Decided Dec. 6, 1982.

Judith Mizner, Boston, Mass., with whom Nancy Gertner, and Silverglate & Gertner, Boston, Mass., were on brief, for defendant, appellant.

C. Brian McDonald, Asst. U.S. Atty., Washington, D.C., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and SWYGERT *, Senior Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

Defendant DeWolf was convicted of conspiracy to possess with intent to distribute cocaine, conspiracy to distribute cocaine, and parallel substantive counts. 21 U.S.C. §§ 841(a)(1) & 846. His principal complaint relates to post-arrest statements made by him, elicited surreptitiously, and without notice to counsel, allegedly in violation of *Massiah v. United States,* 1964, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, and allegedly improperly admitted in evidence. These statements concerned a separate crime, and were admitted to show consciousness of guilt. We affirm.

The significant facts are these. On December 2, 1980, one Lacus, who was the government's principal witness, DEA agent O'Brien, acting as a would-be purchaser, with his true identity being unknown to Lacus, and two others, went to defendant's home in an automobile. Lacus went alone down the driveway, returned with cocaine five minutes later, and requested payment. After being arrested and given *Miranda* warnings, he stated that defendant had been his source. At this point defendant came down the driveway and was arrested. Both were taken to the station.

Some hours later Lacus gave a statement to O'Brien, and agreed to cooperate with the government in return for a promise that if he testified truthfully his cooperation would be made known to the sentencing judge. (At defendant's trial Lacus had yet to be sentenced.) Both were released on bail. Thereafter, according to Lacus, he had two encounters with defendant, the second on December 11. On December 12 he reported to O'Brien,

> "I was told by Mr. DeWolf that I had to make a statement before his lawyer that I was never at his apartment, and if I didn't—somebody had to take a fall. This is the reason I came to Agent O'Brien in the first place, because I was being pressured into making a statement I didn't want to make."

At O'Brien's request, Lacus then made a taped telephone call to defendant in which defendant told Lacus he wanted him to say he had had nothing to do with the defendant; that Lacus had never come to his house, and had just gone behind it to urinate; and that if Lacus would do this he would help him with some trouble he was having with some other people.

On December 16, according to Lacus, he had another encounter with defendant, who told him he wanted Lacus to "take the fall," and that if Lacus would not, or else did not leave town, defendant would get his family first and then take care of Lacus. Defendant said he would help Lacus get a change of identification and passport. Lacus reported this conversation to O'Brien, who arranged for another taped telephone call. In this call Lacus asked defendant to help him leave town with a change of identification and passport. Defendant refused to discuss this over the telephone, but arranged a meeting.

O'Brien and Lacus testified that the purpose of these calls was not to get evidence of the cocaine transaction, but to investigate the pressure that was being put on Lacus. Defendant contends the obverse,

---

* Of the Seventh Circuit, sitting by designation.

and argues that Lacus reported defendant's conversations with him as part of Lacus' agreement to cooperate with O'Brien. In light of the fact that defendant had originated the conversations and Lacus was the one who made contact with O'Brien, this contention was, at best, an inference. The court was well warranted in drawing the opposite inference that Lacus was genuinely apprehensive. Moreover, the government had sufficient cause to investigate the pressure being put on Lacus, and the evidence supports a conclusion that O'Brien's actual intent was not to gather incriminating evidence regarding the cocaine transaction.

■ This case involves, accordingly, a defendant who after arrest unlawfully sought to persuade, by promises and threats, a government witness to give false testimony—in the first instance by giving a false statement to the defendant's attorney. The issue is whether the government is precluded from obtaining statements from defendant on the subject surreptitiously and without the presence of his attorney, or, at the least, from using statements so obtained at his trial.

■ *United States v. Massiah,* ante, forecloses the government from using against defendant at trial "evidence of his own incriminating words, which [the government has] deliberately elicited from him after he [has] been indicted and in the absence of his counsel." 377 U.S. at 206, 84 S.Ct. at 1203. The reason for this is that use of such evidence would interfere with the defendant's right to counsel by depriving him of the benefit of counsel's advice as to everything he says to the government concerning the offense that might be used in his prosecution. We have held previously, however, that *Massiah* does not prevent the government from introducing defendant's statements relating to a separate crime when obtained in the good faith investigation thereof. *Grieco v. Meachum,* 1 Cir., 1976, 533 F.2d 713, 717–18, *cert. denied sub nom. Cassesso v. Meachum,* 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135.

The irony of this case is that the separate statements were designed specifically to affect the trial. However, quite apart from irony, if they reflected on defendant's credibility in such fashion that they would be material evidence at his trial, that is defendant's lookout. *Massiah* is not a magic cloak with respect to future conduct. *Grieco v. Meachum,* 533 F.2d, ante, at 718. We are not faced with a case where the government intended to gather incriminating evidence relating to the original offense, or where the statements were "innocuous except for their implication of consciousness of guilt of the prior crime." *Id.* What would be the consequences if the illegal acts, as distinguished from their investigation, were generated by the government, *cf. United States v. Anderson,* 5 Cir., 1975, 523 F.2d 1192, is also not before us.

Defendant, secondly, contends that he was deprived of adequate representation by counsel, (1) because counsel did not object to the admission of the foregoing testimony, and (2) because he did not object to certain statements of law in the court's charge. The first ground is resolved as a result of our foregoing discussion. As to the second, defendant points to instructions on intent, and reasonable doubt.

a) *Intent.*

The court, on the subject of intent, charged,

"It is ordinarily reasonable to infer that a person intends the natural and probable consequences of his acts knowingly done or knowingly omitted."

This is verbatim the charge given in *United States v. Ariza-Ibarra,* 1 Cir., 1979, 605 F.2d 1216, *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209. We there labelled it "a clear invitation to appellate trouble" in the light of a recent Supreme Court opinion, and cautioned trial courts "to avoid this language in future instructions." *Id.* at 1228. Because of other errors, we reversed without ruling whether the language in fact offended the Supreme Court's ruling, but our directions were unambiguous, and should have been followed.

**4**

■ The charge here appears to be largely boiler plate used as a standard procedure in conspiracy cases. We have no objection, of course, to boiler plate, as such, although we have noted that over-reliance may result in instructions inadequate to the case at hand. *Bosse v. Litton Unit Handling Systems, etc.,* 1 Cir., 1981, 646 F.2d 689, 692 & n. 6. The cure for this, however, is not to over-instruct. A "one size fits all" charge burdens the jury with legal irrelevancies, lowers its attention span, and can only distract it from the true issues. The jury here was instructed at length on all facets of a multi-member conspiracy, as well as provided with a definition of overt acts. In point of fact this was a simple, two-man conspiracy; there were no joiners or leavers; no questionable statements; nor any issues as to overt acts. Even the charge as to intent was irrelevant. There was no question of "knowingly omitted." As to the balance of the sentence, the only issue was whether defendant knowingly performed the acts charged. Beyond this, no inferences were necessary, and there were no "consequences" to ponder.

■ However, although the instruction was regrettable, both as subject to our prior strictures, and as excessive, an evaluation of the total charge shows that it was not prejudicial. *See United States v. Greenleaf,* 1 Cir., 1982, 692 F.2d 182.

b) *Reasonable doubt.*

The weeds that grow in the garden of reasonable doubt are hardy perennials. The trial was held in January, 1981. The court charged the jury, *inter alia,*

"Reasonable doubt exists when after careful and impartial consideration of all the evidence in the case you do *not feel* convinced to a moral certainty that the defendant is guilty of the charge.

"Evidence, in order to say it convinces you beyond a reasonable doubt of the defendant's guilt, must be such evidence as you would be willing to rely and act upon in the most important and vital matters pertaining to your own affairs."

In the three years prior to January, 1981 we had written at least six opinions criticizing these instructions. We deplore that this should be wasted effort. Nevertheless, we have never held them to be plain error. *United States v. Del Toro Soto,* 1 Cir., 1982, 676 F.2d 13, 17. We must again complain, however, that the district court should not expect counsel to do its routine work for it on a matter we have already explicitly covered.

■ All of the now criticized instructions apparently trace their parentage to Devitt & Blackmar, *Federal Jury Practice & Instructions.* The one on intent was recommended in the Second, and in the Third Edition (1977), as to which, ultimately, a supplement noted our contrary decision in *United States v. Ariza-Ibarra,* ante, but not without a fatal time lag. The instructions on reasonable doubt came from the Second Edition, but had already been partially corrected in the Third, obviously without the court's notice. Judges cannot rely solely on "mother's helpers." They are deficient in their duties if they do not personally keep their books, and whatever else they rely on, current with the decisions of their own circuit as they come down.

■ To return to defendant's complaint of ineffective assistance of counsel, when the claim is premised on failure to object to evidentiary rulings or, as in this case, jury instructions, we are reluctant to find ineffective assistance when the rulings by the court do not rise to the level of plain error. To do so would allow a defendant to whipsaw the government, claiming inadequate representation for failure to note objections when not saved by plain error. This is not to say that the cumulative effect of counsel's failure to object to a number of clearly erroneous rulings could not demonstrate ineffective assistance even though there was no plain error. Here, however, not only is there no plain error in the two unobjected to jury instructions, but no aggregation of indicia of incompetence.

*Affirmed.*