**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Tony DARWIN, Defendant-Appellant.**

**No. 82–5794.**

United States Court of Appeals,
Eleventh Circuit.

April 16, 1985.

Stephen J. Finta, Lauderdale, Fla., for defendant-appellant.

Barbara D. Schwartz, Linda Collins-Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, HILL, Circuit Judge, and PECK *, Senior Circuit Judge.

GODBOLD, Chief Judge:

A principal issue in this appeal concerns *Massiah.*[1] While the defendant was in jail following his arrest on narcotics charges,

---

* Honorable John W. Peck, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. *Massiah v. U.S.,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

the government obtained through a wired informant statements made by the defendant without the presence of his attorney, incriminating him on the narcotics charges and on obstruction of justice as well. The government obtained a second indictment on the obstruction of justice charge, consolidated the two indictments for trial and tried them together, introducing the post-arrest incriminating statements. The defendant was convicted on most of the narcotics charges, but the jury was unable to agree on the obstruction of justice charge and a mistrial was declared as to it. These events require us to consider again the application and scope of the "separate offense" exception to *Massiah.*

## FACTS

Appellant Darwin and 18 others were indicted for conspiracy and for importing, possessing, and distributing marijuana in violation of 21 U.S.C. §§ 841, 846, 852 and 853 (1982) and 18 U.S.C. § 2 (1982). Trial on these charges aborted because of the illness of one of the defense counsel. Pending a second trial, Sorrentino, a fellow jail inmate of Darwin (who had no connection with the charges against Darwin) approached the United States Attorney's Office. He stated that he had been approached by Darwin who asked him whether he knew anyone who would kill Sonny Dunn. Darwin said that he wanted to kill Dunn because he was the key witness against Darwin. Sorrentino, who had a long criminal record, went to the U.S. Attorney's Office with this information hoping to obtain a guarantee that he would be released on bond pending appeal of his conviction. He received no guarantee but was told that the government would "try to help." [2]

Just before the second trial of the narcotics case began the government announced *in camera* that it had recorded conversations between Darwin and an informant (Sorrentino) in which Darwin indicated that he wanted key government witness Dunn killed. Darwin's co-defendants moved for

a severance because of the possibility of being prejudiced by Darwin's threats toward Dunn. Darwin also renewed his motion for severance, claiming that he was prejudiced by the other defendants' membership in the "Ethiopian Zion Coptic Church" and their allegedly more extensive involvement in the drug conspiracy. Darwin's case was severed. Later the government secured the indictment against him charging obstruction of justice and was permitted to consolidate the two indictments and try him on both indictments at once.

At Darwin's consolidated trial the government's evidence revealed an ongoing conspiracy to import and distribute marijuana carried on by Darwin's former co-defendants, members of the Coptic Church. Dunn testified as a government witness that, although Darwin was not a Coptic, he worked as a pilot for the church, smuggling marijuana from Colombia into the United States. Dunn also testified that he (Dunn) wanted to distribute marijuana for the Coptics and had paid Darwin to introduce him to church members for this purpose. Darwin made the introduction, and Dunn bought 345 pounds of marijuana from a Coptic named Carl Swanson.

Other evidence showed that Darwin purchased an airplane for over $300,000. Afterwards the plane crashed, and the pilot could not be found. The body of Carl Swanson, who previously had been seen with Darwin, was strapped in the co-pilot's seat. The plane contained approximately 2,000 pounds of marijuana, and evidence aboard tended to show that it had flown from Jamaica.

Sorrentino testified that he had been approached in jail by Darwin with requests to eliminate Dunn. Darwin offered him $15,000 and a Corvette automobile to assist. Darwin asked for Dunn's whereabouts, and Sorrentino delivered to him a bogus map furnished him by the government. Darwin told Sorrentino that he was going to give the map to his (Darwin's) brother when the

---

**2.** Sorrentino was later released on bond.

brother visited the prison; Darwin carried out this plan.

The tapes of the Darwin-Sorrentino conversations were played to the jury. They corroborated Sorrentino's testimony that Darwin sought to include him (Sorrentino) in his plan to prevent Dunn from testifying against him at his upcoming trial.[3] Darwin asked Sorrentino to locate Dunn and assured Sorrentino that his efforts would be rewarded. Darwin also said that he would pass on to his brother the information about Dunn's whereabouts, and that his brother would then be responsible for killing Dunn. Darwin suggested too that he would have Dunn's children killed. Thus, the tapes revealed that Darwin intended to kill Dunn and that he had the means for doing so.

The tapes and Sorrentino's oral testimony also linked Darwin to the narcotics charges through at least two statements by Darwin. Sorrentino asked Darwin how detrimental Dunn was to Darwin's case. Darwin responded that Dunn "can tie me in to the Coptics, cause I introduced him." Rec., Vol. 9 at 754. This answer was both inculpatory as to Darwin's involvement in the narcotics cases and relevant to his motivation for obstructing justice by disposing of Dunn. At another point in their conversation Darwin told Sorrentino about a dispute between Dunn and the Coptics. Darwin stated that the dispute occurred "when I first started flying for the Coptics." Rec., Vol. 9 at 753. While this statement clearly implicated Darwin in the narcotics case its relevance to the obstruction of justice charge was minimal.

Darwin submitted two pretrial motions[4] to exclude the taped conversations and Sor-

rentino's testimony. The district court denied the motions. Darwin also noted his objection to any use of the tapes at an *in camera* proceeding during trial. The objection was overruled.

The government did not limit its offer of the tapes or of Sorrentino's testimony to the obstruction of justice charge. The court gave no limiting instructions as to the evidentiary use of the testimony or the tapes. In closing argument the government repeatedly referred to the tapes as establishing Darwin's guilt on the narcotics charges as well as on the obstruction of justice charge.

Appellant was convicted of the conspiracy, importing, and possession counts of the first indictment. The jury was unable to reach a verdict on the distribution count and on the obstruction of justice charge, and as to them a mistrial was declared.

## DISCUSSION

### I.

*Massiah* established the principle that once the right to counsel has attached by the filing of a formal charge and once the defendant has obtained counsel, any incriminating statements concerning the charge that the state knowingly elicits from the accused without counsel present are inadmissible at trial. The courts have recognized, however, that merely because the right to counsel has attached with regard to one charge, a defendant is not immunized from investigation for other criminal conduct committed thereafter.

*Hoffa v. U.S.*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), recognized a "separate offense" gloss on *Massiah* and held

---

3. At one point Darwin asserted that "I'll guarantee the guy'll never take the witness stand. He won't take it [the witness stand] down here." Rec., Vol. 9 at 793. Darwin's statement evidenced his intent to tamper with an informant in violation of 18 U.S.C. § 1512 (1982). Section 1512 provides in part that:

 (a) [w]hoever knowingly uses intimidation or physical force, or threatens another person, or attempts to do so, ... with intent to—

 • • • • •
 (2) cause or induce any person to—

 • • • • •
 (D) be absent from an official proceeding to which such a person has been summoned by legal process; ...
 shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

4. Darwin's original counsel first submitted the motion to exclude. Darwin's second attorney, appointed after original counsel withdrew from the case, then resubmitted the motion.

that information obtained in the absence of counsel retained for the original offense and pursuant to the investigation of a separate offense is admissible in a separate trial for the separate offense. In *Hoffa* the original offense was violation of the Taft-Hartley Act, and the separate offense was tampering with the jury during the Taft-Hartley trial. Evidence obtained by an informant was introduced in the jury tampering case, and the Supreme Court held this permissible. *Hoffa* implied but did not hold that the evidence of jury tampering might not be admissible in the trial for the original offense. 385 U.S. at 309–10, 87 S.Ct. at 417–418, 17 L.Ed.2d at 386–87.

*U.S. v. Missler*, 414 F.2d 1293 (4th Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970), permitted evidence obtained in the separate offense investigation and in the absence of counsel to be admitted in the separate trial of the separate offense (original offense, hijacking; separate offense, obstruction of justice by a contract to kill a co-defendant expected to testify for the government in the hijacking case).

*U.S. v. Hinton*, 543 F.2d 1002 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976), allowed into evidence recorded conversations obtained by federal agents. Defendant at the time was under indictment on a state narcotics charge and was represented by counsel in that case. Finding no *Massiah* violation, the court held that "*Massiah* speaks only to the situation where in the absence of retained counsel, statements are deliberately elicited from a defendant in connection with a crime for which he has already been indicted." 543 F.2d at 1015.

*U.S. v. Moschiano*, 695 F.2d 236 (7th Cir.1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983), is somewhat tangential but consistent. The defendant, charged with selling heroin, pleaded entrapment. To prove disposition the government introduced evidence of a subsequent transaction with a government agent in which defendant negotiated for the sale of amphetamines. The amphetamine evidence, the product of the separate offense, was held admissible. The court noted that statements were made by defendant during the amphetamine transaction concerning the previous heroin sale but that they were not offered in evidence.

In this circuit, in *U.S. v. Lisenby*, 716 F.2d 1355 (11th Cir.1983) (en banc), the original transaction was a misdemeanor offense for possession of marijuana, for which defendant had counsel. The separate offense was a marijuana conspiracy. After Lisenby was arrested on the misdemeanor charge the government secured through a wired informer statements by Lisenby and his brother tending to show their guilt on the conspiracy charge. We held the statements admissible, noting that:

> ... Lisenby was not tried and the incriminating statements thus not introduced, for the misdemeanor charge he had been arrested for at the time the statements were made. Like Hoffa, Lisenby is attacking his subsequent conviction on other grounds.

*Id.* at 1359. Thus this court, like the Supreme Court in *Hoffa*, implied, but did not hold, that the evidence would not have been admissible in a trial for the original offense.

The Second Circuit, in *Mealer v. Jones*, 741 F.2d 1451 (2d Cir.1984), faced directly the question reached by implication in *Hoffa* and *Lisenby*:

> The question posed here is whether incriminating statements that concern an already indicted offense may, notwithstanding *Massiah*, be introduced at trial on that offense, if they were obtained coincidentally in the course of an investigation into a new crime for which the defendant has not been indicted.

*Id.* at 1453. The original offense was murder, the separate offense suborning perjury of a principal witness. Evidence of the suborning effort was permitted at the murder trial to show consciousness of guilt. The Second Circuit held that this was error but affirmed the denial of habeas corpus because the error was harmless.

In *Mealer* the state court had found that the police investigation into the separate offense was not pretextual. The state contended that this finding was fairly supported by the state court record and thus was binding on the federal court. The circuit court rejected this as irrelevant to a decision on defendant's Sixth Amendment rights. It recognized, however, that the government could bring a charge against defendant on the suborning perjury offense and introduce the incriminating statements at the trial thereof.

The First Circuit also has addressed the admissibility question and has reached a conclusion contrary to that of the Second Circuit. In *Grieco v. Meachum*, 533 F.2d 713 (1st Cir.1976), the original offense was murder, the separate offense subordination of perjury. Here too, like *Mealer*, evidence of the suborning effort was admitted at the murder trial to show consciousness of guilt. The *Grieco* court, however, found that neither the investigation of the second offense nor the use of the evidence at the trial for the original offense violated *Massiah:*

> Exclusion of relevant, otherwise admissible testimony, is a remedy for past violations of the constitution. As there was no violation of ... [defendant's] constitutional rights in obtaining the information contained in ... [the informant's] testimony, we can see no constitutionally required reason to exclude it from the trial in question.

*Grieco*, 533 F.2d at 718. The court qualified its holding by suggesting that it might have decided the case differently if the government's actual intent had been to obtain testimony against defendant for use at his murder trial or if the statements had been innocuous except for their implication of defendant's consciousness of guilt of the prior crime. *Id. U.S. v. DeWolf*, 696 F.2d 1, 3 (1st Cir.1982), reiterated *Grieco's* reasoning, noting that *"Massiah* is not a magic cloak with respect to future conduct," and that absent government bad faith or pretext a defendant is accountable for the consequences of talking to third parties.

The tension between the First Circuit view and the Second Circuit view illustrates that the problem is not free from doubt. The difficulties in the First Circuit view are pointed out by the Second Circuit in *Mealer*, where the separate offense was an attempt to suborn perjury in the trial of the original offense. It was inevitable that if an investigation directed at the second offense turned up evidence of subornation, that evidence would further incriminate the defendant on the original offense. At least where the separate offense is subornation of perjury or the threat to kill or harm a witness or the prosecuting attorney, or the separate offense in some other way affects the trial, the idea that the government is pursuing a separate investigation that will be independent of the original offense is essentially an illusion.

In *DeWolf* the First Circuit trenchantly noted the irony that the separate statements were specifically designed to affect the trial of the original offense (and, inferentially, should then be admissible in that trial). 696 F.2d at 3. The court noted further that if the statements reflected on defendant's credibility in such fashion that they would be material evidence at his [original offense] trial, "that is defendant's lookout." *Id.*

Perhaps the tension between the two views can best be understood as a value choice between, on the one hand, the social utility in giving law enforcement officers relatively wide latitude to investigate what appear to be violations of the law, and, on the other hand, the individual's interest in a broadly construed Sixth Amendment right to counsel.

■ We come down on the side of the First Circuit and the societal interest in law enforcement, so long as investigating officers show no bad faith and do not institute the investigation of the separate offense as a pretext for avoiding the dictates of *Massiah*. Barring use of the evidence where there is bad faith or pretext will tend to inhibit the government from overreaching and from doing indirectly what *Massiah* prohibits it from doing directly.

It is obvious that in many instances the government will have a mixed motive in pursuing a criminal investigation. This should not, however, preclude using the evidence nor should it require the court to adopt a middle position (i.e., use the evidence of the separate offense either in a separate trial on that charge or in a joint trial if it can be sufficiently sanitized, and do not use it at all as proof of the original offense). Whether one takes this position depends on how one views the *Massiah* principle in the first instance. We reject this approach because we conclude that the right to the presence of counsel simply does not extend to a situation in which the defendant is engaged in the commission of a separate offense. Indeed, insisting upon the presence of counsel has a certain unreality. Probably the accused is not going to speak of a proposed second offense in the presence of his counsel (and if he is so foolish as to do so counsel may be obligated to reveal it). The requirement that counsel be present means, in effect, that the government may not fruitfully pursue from the suspect himself evidence of the second offense. Adopting the middle position of only allowing a limited use of such evidence would in essence vindicate a right of the accused to have his counsel present while he is being investigated for a separate offense because of the possibility that he might talk about the first offense as well. We believe that *Massiah* does not go this far.

■ In this case the taping of the Darwin-Sorrentino conversations did not violate *Massiah*, because the conversations were recorded pursuant to investigation of a separate offense and there is no evidence of pretext or bad faith. Sorrentino approached the U.S. Attorney with information about threats to kill a witness, and law enforcement officers set about to investigate this information. They would have been derelict in their duty had they not done so. Darwin obliged by uttering his

threats into a tape recorder. Furthermore, the second factor relied on in *Grieco* is satisfied, because the evidence turned up relating to obstruction of justice was substantial.

■ Therefore, in this instance there was no error in consolidating the two cases. The evidence in question for the most part was relevant to both cases and was not barred by *Massiah* in either. And in trial the evidence of what Darwin said did not have to be offered for a limited purpose, nor were limiting jury instructions required.

## II.

■ During Darwin's trial prison officials searched his cell and confiscated papers after receiving information that he had put out a murder contract on his estranged wife. He moved for a mistrial, arguing that the seizure violated the Fourth Amendment. *Hudson v. Palmer*, — U.S. ——, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), however, holds to the contrary. *Hudson* holds that inmates have no reasonable expectation of privacy in their cells entitling them to the Fourth Amendment's proscription against unreasonable searches and seizures.[5]

Darwin, furthermore, suffered no harm since none of the material was introduced at his trial. He contends that the seizure prejudiced his defense because notes that he needed at trial were among the material seized. But the trial judge examined the papers and found that none had anything to do with the case. Denial of mistrial was not error.

## III.

Dunn testified as a government witness on Thursday, April 15, and cross-examination extended over into Friday. Dunn did not appear in court on Monday, and the trial judge noted that he was indisposed. Cross-examination began again on Tues-

---

**5.** Subsequent to his conviction Darwin brought a *Bivens*-type action against the prison and its officials. We rejected his Fourth Amendment claim relying upon *Hudson, supra. See Darwin v. U.S.*, 753 F.2d 1086 (11th Cir., 1985).

day, April 20. On Friday, April 23, after Dunn's testimony had been completed, the government notified the trial judge that it had received information possibly connecting Dunn to an ongoing drug transaction in Florida. Dunn had not been identified with certainty. The government initially obtained this information from state agent Manny Funes on the previous Monday; it was verified by the government four days later on Friday and then brought immediately to the trial judge's attention.

The judge passed the information on, in general terms, to defense counsel and asked that they not say anything about it over the weekend so as not to interfere with the investigation. The judge also told defense counsel that there was additional information that had been brought to his attention by the government but that he was unable at that time to disclose it to counsel. That information concerned statements made by Dunn's wife about the weekend drug transaction. The statements were made to a confidential informant and were not disclosed to Darwin's defense counsel in order to protect the informant.[6]

■ On appeal Darwin contends that the disclosure made to him was both untimely and incomplete and therefore violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The disclosure was made to the court and to defense counsel on a Friday, but the government had first learned of Dunn's possible involvement in a drug transaction on the previous Monday. The disclosure was untimely, Darwin says, because it came after Dunn had testified. The point in the trial when a disclosure is made, however, is not in itself determinative of timeliness. We agree with those circuits holding that a defendant must show that the failure to earlier disclose prejudiced

him because it came so late that the information disclosed could not be effectively used at trial. *See U.S. v. Allain*, 671 F.2d 248 (7th Cir.1982); *see also U.S. v. Warhop*, 732 F.2d 775 (10th Cir.1984); *U.S. v. Higgs*, 713 F.2d 39 (3d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984); *U.S. v. Xheka*, 704 F.2d 974 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *U.S. v. Olson*, 697 F.2d 273 (8th Cir.1983). Appellant here made no such showing. In fact, although Dunn had completed his testimony, the trial itself was far from over. Appellant could have recalled Dunn for further questioning but chose not to.

■ The limited nature of the disclosure also did not violate *Brady*. At the government's request the district court informed appellant that Dunn might have been involved in a narcotics transaction still under investigation. Darwin was put on notice that evidence possibly relevant for impeachment purposes was developing.[7] *Brady* does not require that in this case the government should have done more and given appellant more detailed information. Darwin simply does not show how he was harmed and how the limited disclosure rendered his trial unfair. *U.S. v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Had the disclosure been more complete and had the district court permitted the immediate use of the disclosed information, Dunn might have effectively prevented the use of the information or limited its value by invoking the Fifth Amendment. Moreover, even if all the information that the government then possessed could have been presented to the jury, there still would have been no *Brady* violation because Darwin has not demonstrated the

---

6. Although we cannot locate it in the record, the government states, and appellant does not dispute, that approximately one week later the government learned, and advised the court and defense counsel, that the drug transaction had fallen through. Furthermore, no one could identify Dunn as a party to that transaction. Subsequent to the trial, however, Dunn was

indicted on a third and separate narcotics transaction.

7. Darwin's theory was that the government was permitting Dunn to engage in criminal activities in exchange for his services as an informant and witness. Counsel hoped, thus, to impeach Dunn by showing his bias and a motive for not testifying truthfully.

materiality of the suppressed information. *See Sellers v. Estelle,* 651 F.2d 1074 (5th Cir.1981) (in establishing *Brady* violation, defendant must prove: (1) prosecutor suppressed evidence; (2) evidence was favorable to defense; (3) evidence was material), *cert. denied,* 455 U.S. 927, 102 S.Ct. 1292, 71 L.Ed.2d 472 (1982)). Suppressed evidence useful only for impeachment purposes is material if its disclosure probably would have resulted in acquittal. *See U.S. v. Mesa,* 660 F.2d 1070 (5th Cir.1981) (Unit B); *U.S. v. Martino,* 648 F.2d 367 (5th Cir.1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982). Darwin does not contend that disclosure probably would have resulted in his acquittal, and in the face of the overwhelming evidence of his guilt he could not do so successfully. Furthermore, he did question Dunn on cross-examination about any preferential treatment accorded him by the government in exchange for his testimony. He was able to question Dunn's credibility and bias before the jury. Appellant has not shown what the additional information would have added. *See U.S. v. McCrary,* 699 F.2d 1308 (11th Cir.1983). Under these circumstances we find no *Brady* violation.

## IV.

Cross-examination is a vital aspect of a defendant's right to confront witnesses against him. *See U.S. v. Berkowitz,* 662 F.2d 1127 (5th Cir.1981) (Unit B). Darwin's right to cross-examine Dunn and Sorrentino, however, was not unconstitutionally restricted. Dunn testified on direct examination that he was a convicted felon and that he had sold and used drugs. Cross-examination was primarily aimed at further discrediting Dunn's credibility. Appellant was allowed to inquire into Dunn's past and present financial situation, prior convictions and illegal acts, and the reasons for and times when he sold marijuana. While he was allowed to ask whether Dunn had filed income tax returns, the court prohibited questions about the content of those returns as being of minimal relevance.

 The extent of cross-examination with respect to the credibility of a witness is within the sound discretion of the trial court. *See U.S. v. Holman,* 680 F.2d 1340 (11th Cir.1982). Where, as here, the defendant was permitted sufficient cross-examination into a witness's credibility, the trial court's limiting of cross-examination will not be disturbed absent an abuse of discretion. *See U.S. v. Tolliver,* 665 F.2d 1005 (11th Cir.), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982). There was no abuse where questions relating to Dunn's income tax returns were curtailed because of their limited relevancy.

 To prove bias appellant cross-examined Dunn as to any preferential treatment he may have received from the government in exchange for his testimony in this case. Dunn testified that he received no favors or promises of leniency. Darwin also inquired into any prior involvement with, and preferential treatment from, the government in connection with other cases. Dunn denied previous contact with the government. Appellant was prevented from asking more specific questions relating to a "protective cloak" given to Dunn by the government. The court's decision to prohibit these questions did not constitute an abuse of discretion because the court stated that further inquiry would be permitted if defendant could proffer some evidence of this "protective cloak." Evidence was not proffered, thus the court did not abuse its discretion by limiting the scope of cross-examination. *See U.S. v. Diecidue,* 603 F.2d 535 (5th Cir.1979); *see also U.S. v. Tolliver, supra.*

 The court did not improperly fail to inquire into the validity of Dunn's invocation of the Fifth Amendment. *U.S. v. Goodwin,* 625 F.2d 693 (5th Cir.1980), does not require us to hold otherwise. In *Goodwin* witnesses who could have presented key evidence supporting defendant's entrapment defense made blanket assertions that they would not testify based upon the Fifth Amendment. The district court did not inquire into the reasonableness of their claims and neither witness testified at all.

On appeal the court held that the "trial judge must make a proper inquiry into the legitimacy and scope of the witness' assertion of his Fifth Amendment privilege. A blanket assertion of the privilege without inquiry by the court, is unacceptable." *Id.* at 701.

In the instant case the witness Dunn made no blanket assertion of his Fifth Amendment right. He invoked the privilege in response to questions suggesting his involvement in criminal activities. That his answers would be incriminating was self-evident; for example: "Q. Did you ever deal any drugs with any of these people? A. I will refuse to answer that." Rec., Vol. 4 at 235. Further inquiry by the trial court was unnecessary. In order to sustain a claim of the privilege, "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman v. U.S.,* 341 U.S. 479, 486–87, 71 S.Ct. 814, 818–19, 95 L.Ed. 1118, 1124 (1951). In this case, then, where the witness was responding to particular questions relating to his credibility and invoked the Fifth Amendment as to questions whose tendency to incriminate was self-evident, the necessity for further inquiry was not present and *Goodwin* is inapposite. *Cf. U.S. v. Tsui,* 646 F.2d 365 (9th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982).

■ There also was no error in refusing to strike Dunn's testimony. Direct testimony is stricken only if "defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness's direct testimony." *Fountain v. U.S.,* 384 F.2d 624 (5th Cir.1967), *cert. denied,* 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968); *see also U.S. v. Diecidue, supra.* The few questions asked of Dunn to which he did assert a Fifth Amendment privilege went to his general credibility and possible bias. Appellant does not demonstrate how Dunn's refusal to respond "substantially prejudiced" his ability to disprove Dunn's direct testimony. *See, e.g., U.S. v. Martino, supra* (where defendant was not hampered in testing truth of witness's direct testimony and witness's credibility had already been subject of comprehensive cross-examination, responses elicited by defendant's questions would have been cumulative evidence).

■ Appellant's claim that he was not permitted to question the credibility of Sorrentino is meritless. He appears to point to the examination of FBI agent Harold Copus as the primary source of the alleged error. He argues that while the trial court permitted the prosecution to present evidence as to the accuracy of Sorrentino's information given to the government, he was prevented from presenting evidence that rebutted that claim. On direct examination, over defense counsel's objection, the government elicited from Agent Copus testimony that Sorrentino had given him accurate and truthful information in connection with another investigation. Error, if any, was cured by cross-examination. *See U.S. v. Truitt,* 440 F.2d 1070 (5th Cir.), *cert. denied,* 404 U.S. 847, 92 S.Ct. 150, 30 L.Ed.2d 84 (1971). Contrary to appellant's contention, he was allowed to question Copus about the other investigation and to inquire into how Copus knew the information given by Sorrentino was accurate. Furthermore, Darwin elicited from Copus a concession that he did not know Sorrentino's general reputation for truthfulness in the community but only that his information in connection with the previous investigation had been accurate. Copus also acknowledged that Sorrentino had a vested interest in the other investigation (as well as the current one). In addition, appellant did not attempt to rebut Copus's testimony by introducing evidence of inaccurate information provided by Sorrentino to Copus. Moreover, we cannot find, and appellant does not point us to, any other instances in the trial where appellant unsuccessfully attempted to introduce evidence of inaccurate information provided other government agents by Sorrentino.

 Darwin's argument that the trial court refused to allow the testimony of other witnesses as to the protection and liberal treatment accorded Dunn by the government is without basis. The testimony of the one witness that was excluded by the court was properly excluded because it violated Fed.R.Evid. 608(b) (proof of character by extrinsic evidence) and because its probative value for showing that the government permitted Dunn to violate the law was greatly outweighed by its tendency to confuse the issues and mislead the jury.[8] *See* Fed.R.Evid. 403.

 The trial court did not admit into evidence testimony of defense witness Jim Beck, a private detective, stating that government agent Manny Funes harassed him for investigating Sonny Dunn. This testimony was relevant to appellant's claim that Dunn received preferential treatment for favorable testimony. Assuming that exclusion of this testimony was improper, the exclusion was not reversible error because it had no substantial probative value. There was sufficient evidence to support appellant's conviction. *See U.S. v. Stout,* 667 F.2d 1347 (11th Cir.1982).

#### V.

Darwin's contention that the evidence was insufficient to support the verdict is frivolous.

#### VI.

Consolidating the two indictments for trial was not fundamentally unfair. A decision to consolidate will not be reversed absent an abuse of discretion. *See U.S. v. McCulley,* 673 F.2d 346 (11th Cir.), *cert. denied,* 459 U.S. 852, 103 S.Ct. 116, 74 L.Ed.2d 102 (1982). No abuse or unfairness occurred here where the two indictments were closely related, *see U.S. v.*

*Scott,* 659 F.2d 585 (5th Cir.1981) (Unit B), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 105 (1982), and where joinder did not violate *Massiah v. U.S.,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). *See* discussion in section I.

AFFIRMED.

---

8. Darwin repeatedly attempted to prove by extrinsic evidence specific instances of Dunn's bad conduct in order to attack his credibility. The specific instances did not involve criminal convictions and were not probative of truthfulness. They were thus not saved by Fed.R.Evid. 608(b). Counsel attempted to introduce the testimony, nevertheless, insisting that it demonstrated Dunn's bias—that he gave testimony favorable to the government in exchange for being permitted to engage in criminal activity. More often than not, however, the purported evidence did not substantiate Darwin's claim.