COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Clements and Beales
Argued at Richmond, Virginia


JOHN EDWARD STEWART

                                                        MEMORANDUM OPINION[*] BY
v.        Record No. 2355-05-2                 JUDGE JEAN HARRISON CLEMENTS
                                                             JANUARY 16, 2007
COMMONWEALTH OF VIRGINIA


                    FROM THE CIRCUIT COURT OF NOTTOWAY COUNTY
                                  Thomas V. Warren, Judge

          Keith N. Hurley (Keith N. Hurley, P.C., on brief), for appellant.

          Karen Misbach, Assistant Attorney General (Robert F. McDonnell,
          Attorney General, on brief), for appellee.


        John Edward Stewart (appellant) was convicted in a bench trial of two counts of uttering

checks knowing them to have been forged and two counts of forgery, in violation of Code

§ 18.2-172.  On appeal, he contends the trial court erred in (1) refusing to grant a mistrial when the

Commonwealth failed to disclose exculpatory information until after the presentation of appellant's

evidence and (2) admitting photocopies of the subject checks into evidence.[1]  We agree with

appellant that the trial court erred in not granting a mistrial, and therefore reverse his convictions.

        As the parties are fully conversant with the record in this case, and because this

memorandum opinion carries no precedential value, this opinion recites only those facts and

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Appellant was also granted appellate review on the issue of whether the evidence was
sufficient to prove he altered the checks.  However, because he did not address this issue on
brief, we will not consider it here.  See Rule 5A:20(e); Buchanan v Buchanan, 14 Va. App. 53, 56,
415 S.E.2d 237, 239 (1992) (holding that claims of error "unsupported by argument, authority, or
citations to the record do not merit appellate consideration").

incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

## I. BACKGROUND

Appellant was charged with forging and uttering two checks, one dated September 24, 2004, which had been altered from $144.00 to $444.00 (check 1), and another dated September 17, 2004, which had been altered from $280.00 to $880.00 (check 2). Appellant had received check 1 and check 2, along with three other payroll checks, in payment for wages earned while an employee of Donald Lewis of Lewis Construction. Lewis had employed appellant for approximately one and a half months during the late summer and early fall of 2004.

Appellant cashed the checks at Baldwin Auto Sales (BAS), where he had bought several cars in the years leading up to the events in question. Over the same period of time, various BAS employees had cashed more than twenty-five payroll checks a year for appellant, although no records of those transactions were kept. After BAS deposited check 1 and check 2 into its account at the bank, the bank returned the checks to BAS because they had been altered.

Deputy Robert Jones of the Nottoway Sheriff's Department questioned appellant in two separate interviews, during each of which appellant denied having altered the checks. Appellant told Deputy Jones that "no one else had handled the checks" between the time he received them from Lewis and the time he cashed them at BAS. He also told the deputy that he had received only the proper, original amounts in exchange for the checks when he cashed them at BAS. At appellant's request, Deputy Jones sent check 2 to the "state lab" for handwriting analysis.

A pretrial discovery order was entered, directing the Commonwealth to "provide the defendant with all information of whatever form, source or nature that tends to exculpate the defendant either through indication of his innocence or through the potential impeachment of any government witness." The Commonwealth was to provide such information "in writing not less

than fifteen (15) days prior to [trial]." The prosecutor informed defense counsel that "there wasn't any" such exculpatory evidence.

At trial on June 1, 2005, the Commonwealth sought to introduce into evidence copies of each check. The first document was a photocopy of check 1, which was attached to the notice from the bank indicating that the amount of the check had been altered. Together with the notice from the bank, the photocopy of the check was marked for identification as "Commonwealth's Exhibit #1" (exhibit 1). Lewis identified exhibit 1 as a paycheck from his company made payable to appellant for work appellant had done while in Lewis's employ. Lewis testified, without objection, that the check had been written for $144.00, not the $444.00 amount reflected in exhibit 1. During Lewis's testimony, appellant's counsel objected on hearsay grounds to the admission of any evidence regarding notices received from the bank stating that the check had been altered. The prosecutor asserted that such evidence was "not offered to prove that [the check] was altered because [Lewis had] already testified it was altered." The trial judge overruled the objection on that basis.

Mike Baldwin, treasurer of BAS, testified on direct examination as follows regarding exhibit 1:

> [THE PROSECUTOR]: I'm going to show you [a] check marked for identification as number one and ask you as treasurer if you had any business with that particular --
>
> A: Yes, sir. I . . . know about that check and how it was cashed and that it came back and we had to pay for this check also.
>
> THE COURT: Cashed it for how much?
>
> THE WITNESS: This was the four hundred and forty-four dollar check.
>
> THE COURT: Did you cash that one or did your father cash it, or do you know?
>
> THE WITNESS: I do not know.

- 3 -

THE COURT: But, your records show that it was cashed by your company.

THE WITNESS: Our company cashed it, but we don't know which one of us cashed it.

Asked on cross-examination if there was any written record of the transaction, Mike Baldwin responded: "No, sir. No more than the check itself that we did cash it."

William Baldwin, Mike Baldwin's father and a salesman at the business, testified that he received a photocopy of check 1 when it was returned from the bank, but not the original. Deputy Jones testified that, despite his attempt to retrieve it, the bank was not able to provide him with check 1 in its original form.

The second document was a facsimile from the state lab of check 2. It was marked for identification as "Commonwealth's Exhibit #2" (exhibit 2). Lewis identified exhibit 2 as a paycheck from his company made payable to appellant. Lewis testified the check had been written for $280.00, not the $880.00 that appeared on exhibit 2. Exhibit 2 showed that check 2 had been stamped by the bank "returned not paid . . . altered." Mike Baldwin testified that he saw his father cash check 2 for appellant but did not see how much it was cashed for. Although he could not recall the date the check was cashed, he remembered the transaction because appellant expressed interest that day in purchasing a car, despite still owing BAS a balance on another vehicle. Mike Baldwin stated that, as treasurer of the company, he was aware that check 2 had been deposited into BAS's bank account for $880.00 because, when check 2 was returned from the bank unpaid, BAS had to pay the bank $880.00 to cover the check. He also testified that he was unaware the check had been altered until it was returned by the bank. After being shown exhibit 2, William Baldwin testified that he personally cashed check 2 for appellant for $880.00. He admitted on cross-examination, however, that he had no record of that transaction and recalled the amount only because he read it

- 4 -

off the copy of the check he was just shown.[2]  William Baldwin also testified that he could not tell the check had been altered when he cashed it for appellant.  Deputy Jones testified that he received the original check from William Baldwin before sending it to the state lab.  The original was still at the lab at the time of the trial.

During the direct examination of William Baldwin, appellant's counsel objected to the admission of exhibit 2, explaining:  "[M]y objection is not to the photocopy of the check, [but to the stamp] on it. . . .  I don't want the check [itself] to serve as proof that it was altered."  The trial judge responded, "I don't consider this stamp that says altered, as somebody at the bank testifying to the truth of it [having] been altered."  The prosecutor agreed, stating, "[W]e're relying not on [the stamp] at all, but on the maker of the check indicating that he wrote it for a different amount and, ipso facto, somebody altered the check."  Defense counsel replied, "That's fine."  After the trial judge reiterated that the stamp on exhibit 2 would not serve as proof that check 2 had been altered, the direct testimony of William Baldwin continued.  Exhibit 2 was not introduced into evidence at that time.

Later, after Deputy Jones was recalled as a witness, the Commonwealth offered exhibit 1 and exhibit 2 into evidence.  Appellant objected to the admission of exhibit 1, arguing that, in the absence of testimony by bank personnel, the best evidence rule precluded the admission of the photocopy of check 1 and the hearsay rule precluded the admission of the attached notice from the bank.  The court overruled the objection, admitting exhibit 1 into evidence as a "business record . . . [and] despite the best evidence rule."  Appellant made no objection to the admission of exhibit 2 at the time.

---

[2] The Commonwealth expressly concedes in its appellate brief that this is the correct recitation of William Baldwin's testimony.

At the close of the Commonwealth's evidence, appellant moved to strike the evidence on the ground that the Commonwealth failed to prove the checks had been altered when he cashed them. The evidence did not prove, appellant's counsel argued, "what happened—how [the checks] got altered . . . [,] at what stage [they] got altered," or who altered them. The trial judge denied the motion, stating: "The checks that were handed to [appellant were] one hundred forty-four and two hundred eighty. As to whether or not he altered them or somebody else altered them or what, it's obvious to me they were altered at the time [appellant] cashed the checks."

Appellant testified in his own defense. He did not dispute that he had received the checks or that he had cashed them, but maintained he had neither altered nor fraudulently negotiated either check. He testified that the checks had not been altered at the time he negotiated them to BAS and that he had received from William Baldwin the original, proper value in exchange for each.

After listening to appellant's direct testimony, the prosecutor became aware that he was in possession of information potentially relevant to appellant's testimony and to appellant's guilt or innocence. The prosecutor immediately informed appellant and the trial judge that, in January 2005, the Commonwealth received a complaint from BAS personnel that an employee named Jones, who was not authorized to access the cash drawer, had been "caught in the act of trying to steal the money from the cash drawer." Jones, according to the prosecutor, was a "multiple convicted felon and a thief," who had worked at BAS since before September 2004. There had been no money missing from the cash drawer, and a grand jury had refused to indict on the complaint. The prosecutor explained that the information may nevertheless have been exculpatory because Jones "was in fact working [at BAS] at the same time" appellant cashed the checks at BAS and "[Jones] could have stolen the money and forged the checks himself."

Upon receiving the information, appellant's attorney moved for a mistrial on the ground that he "should have had that information before, [as] that would have put things in a different light, certainly, as far as the trial goes." The prosecutor opposed the motion.

When asked by the trial judge how such information was relevant, the prosecutor explained that, without the disclosure of the new information, the trial judge would have had only two theories to choose from: "Either [appellant] . . . forged [the checks] and got the money or the Baldwins gave him the original [amounts] and changed [the checks] themselves." With the disclosure of the new information, however, the prosecutor continued, defense counsel could now "conceivably argue it was another employee who could have stolen the money and altered the checks."

The trial judge denied the motion for a mistrial, stating: "I don't think it's exculpatory. I think it's one of those things that's a stretch . . . . [The crime charged against appellant occurred in September 2004, so] I don't think that would be exculpatory evidence that there's somebody in [BAS] that was charged with stealing money in January [2005]."

Appellant recalled Mike Baldwin. He testified that Jones was working at BAS in September 2004. Baldwin explained that Jones cleaned "floors and things like that" for the company, "but [they] tried not to ever leave him in [the office with the cash drawer] by himself at all." However, Baldwin further testified, Jones was in the office helping him stuff envelopes one day when Baldwin left the room. "And," Baldwin continued, "something just told me to go back and check, and I did. . . . I went back and looked, and . . . Jones was in my money drawer just going at it. And, when I walked in, he dropped the money that was in the drawer." Baldwin testified that the checks they cashed "would be kept in the same drawer" as the money. Baldwin fired Jones after the incident, although Baldwin was unable to say with certainty when the incident occurred. Baldwin did not know whether Jones "ever attempted to cash any checks that were written to the business."

Appellant than renewed his motion to strike, and the trial judge denied the motion. After closing arguments, the judge addressed appellant, stating in part:

> Again, I acknowledge it hasn't been as pretty as they usually are in so far as connecting up everything, every i being dotted and every t being crossed and checked and so forth.
>
> What also sort of doesn't tie in the way I wish it had -- I wish the way it would, so it would be a better or clearer picture, is who cashed the check exactly, a log and so forth. I'm reluctant to say that either Mr. Baldwin is not a good business man . . . but how they cash checks is somewhat problematic. And, I'm frankly surprised that they don't have more trouble. . . .

> *      *      *      *      *      *      *

> As to [your] suggestion that maybe this other person that was a dishonest person somehow had something to do with this is just a grand stretch in so far as I'm concerned. The notion that maybe after Mr. Baldwin cashed the check that [this dishonest employee] would have altered it for some reason . . . , that suggestion doesn't make any sense at all to me. You said steadfastly you took the checks there, you cashed them for one hundred forty-four and you cashed them for two hundred eighty, but just because you insist that's what you did and just because you steadfastly said that, doesn't mean that it's so.
>
> Mr. Baldwin said to the contrary. Why would they lie about one of their customers? Why would they say that we gave Stewart eight hundred eighty dollars . . . ? We gave Stewart four hundred forty-four dollars . . . ? Why would they do that? Why would they say that if they didn't do it? Why would they give you the two hundred eighty and one hundred forty-four and then they -- maybe Mr. Baldwin altered the check. Why would he do it? Why would anybody do it but you? It doesn't make any sense whatsoever why anybody would do this but you, Mr. Stewart.

The trial judge found appellant guilty as charged, and this appeal followed.

## II. MOTION FOR MISTRIAL

Appellant claims the trial court erred in denying his motion for a mistrial. He argues that the Commonwealth's failure to timely disclose the information about Jones denied him his constitutional rights under Brady v. Maryland, 373 U.S. 83 (1963). We agree.

- 8 -

"[W]hether a trial court should grant a mistrial is a matter resting within its discretion, and absent a showing of abuse of discretion, the court's ruling will not be disturbed on appeal." Cheng v. Commonwealth, 240 Va. 26, 40, 393 S.E.2d 599, 607 (1990). However, "by definition, when the trial court makes an error of law, an abuse of discretion occurs." Bass v. Commonwealth, 31 Va. App. 373, 382, 523 S.E.2d 534, 539 (2000).

"We review [appellant's claim] under settled constitutional principles concerning the disclosure of exculpatory evidence." Lovitt v. Warden, 266 Va. 216, 244, 585 S.E.2d 801, 817 (2003). "In Brady . . . , the Supreme Court held that a due process violation occurs when the prosecution suppresses evidence favorable to an accused that is material either to guilt or to punishment, irrespective whether the prosecution acted in good faith or bad faith." Id. (citing Brady, 373 U.S. at 87).

Here, there is no question that the prosecutor suppressed evidence that was favorable to appellant. The prosecutor acknowledged at trial that he did not timely inform appellant that the Commonwealth had received information that Jones, a "multiple convicted felon and a thief" who worked at BAS since before September 2004, had been "caught in the act of trying to steal the money from the cash drawer" in January 2005. The prosecutor further acknowledged that the withheld information showed that Jones "was in fact working [at BAS] at the same time" appellant cashed the checks at BAS and that "[Jones] could have stolen the money and forged the checks himself." Thus, the suppressed information clearly lent support to the defense's theory that someone at BAS forged the checks after they had been cashed by appellant and before they were deposited in the company's bank account.

The question remains, however, whether the information about Jones was material to appellant's guilt or punishment. "'[I]mplicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.'" United States v. Bagley,

473 U.S. 667, 674-75 (1985) (quoting United States v. Agurs, 427 U.S. 97, 104 (1976)).

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. at 682. "At the heart of this inquiry is a determination whether the evidence favorable to the defendant could reasonably be considered as placing the entire case in such a different light that confidence in the verdict is undermined." Lovitt, 266 Va. at 244, 585 S.E.2d at 817 (citing Strickler v. Greene, 527 U.S. 263, 290 (1999)). Indeed, as the United States Supreme Court has stated:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

Agurs, 427 U.S. at 112-13 (footnotes omitted). "[T]he determination whether undisclosed exculpatory evidence was material must be made by considering its cumulative effect." Lovitt, 266 Va. at 244, 585 S.E.2d at 817 (citing Kyles v. Whitley, 514 U.S. 419, 436 n.10 (1995)).

Here, the defense's theory of the case does not contradict the Commonwealth's evidence that the two checks were at some point altered. Rather, appellant's theory of the case challenges only the Commonwealth's claim that he was the one who altered them. Consistent with his contention that the checks were not altered while in his possession, appellant testified on his own behalf that he did not alter the checks and that he received only the proper amount in return for each check when he cashed them at BAS.

The trial judge made a contrary factual determination based on the testimony of William and Mike Baldwin that appellant cashed the checks for $444.00 and $880.00—the altered amounts. However, the testimony offered by William and Mike Baldwin regarding the amount appellant received from BAS in exchange for the two checks was equivocal at best. When asked how much check 1 was cashed for, Mike Baldwin obliquely responded, "This was the four hundred and forty-four dollar check." He further testified that he did not know who at BAS cashed the check for appellant and that the copy of the returned, altered check for $444.00 was the only record they had of cashing the check. Additionally, while William Baldwin testified initially that he cashed check 2 for $880.00, he admitted on cross-examination that he had no independent recollection of the amount and recalled that it was $880.00 only because he had just read it off the copy of the $880.00 check he was shown at trial. In finding appellant guilty as charged, the trial judge himself acknowledged the Commonwealth's evidence regarding the cashing of the checks was not as clear and complete as he would have preferred.

The strength of the Commonwealth's case is further diminished by the fact that the check alterations went undetected by BAS personnel until the checks were returned by the bank. William Baldwin testified he could not tell check 2 had been altered when he cashed it for appellant. Conversely, the prosecutor described the alterations as being immediately apparent to anyone who looked at them. The trial judge characterized them as being "pretty obvious" to him. Indeed, the trial judge commented that the checks were so carelessly altered and suspicious looking he did not know why BAS personnel had cashed them. Having reviewed exhibit 1 and exhibit 2 in the record, we do not disagree with the trial judge's assessment of the alterations. Plainly, William Baldwin's testimony that he could not tell check 2 had been altered and the fact that the checks were obviously altered supports appellant's theory that the checks were altered only after he cashed them.

Given the evident weakness of the Commonwealth's case, we conclude that the information withheld by the prosecutor about Jones is "sufficient to undermine confidence in the outcome" of the case. Bagley, 473 U.S. at 682. As previously mentioned, Jones, a "multiple convicted felon and a thief," was working at BAS when appellant cashed the checks. Mike Baldwin testified that, sometime after the checks were cashed, he caught Jones trying to steal money from the cash drawer. Mike Baldwin further testified that they "tried not to ever leave [Jones] in [the office with the cash drawer] by himself at all." However, as evinced by the reported incident, Jones was indeed sometimes left in the office by himself. Mike Baldwin also testified that the cashed checks were kept in the cash drawer and that he was unsure whether Jones had "ever attempted to cash any checks that were written to the business." Clearly, the suppressed evidence reveals that Jones had the motive and opportunity to commit the offenses attributed to appellant. Because of its tenuous nature, the Commonwealth's evidence does not exclude the reasonable hypothesis of innocence that Jones altered the checks cashed by appellant and stole the corresponding money from the cash drawer. Accordingly, the withheld information "could reasonably be considered as placing the entire case in such a different light that confidence in the verdict is undermined." Lovitt, 266 Va. at 244, 585 S.E.2d at 817. We hold, therefore, that the suppressed evidence about Jones was material to appellant's guilt.

The Commonwealth asserts that, even if the withheld information was exculpatory and material, "any due process violation was cured by the prosecutor's disclosure" of that information at trial. Thus, the Commonwealth argues, the trial judge did not err in denying appellant's motion for a mistrial because appellant was not prejudiced by the belated disclosure of the evidence regarding Jones. We disagree.

> Late disclosure does not take on constitutional proportions
> unless an accused is prejudiced by the discovery violations
> depriving him of a fair trial. So long as exculpatory evidence is
> obtained in time that it can be used effectively by the defendant,

and there is no showing that an accused has been prejudiced, there is no due process violation. It is the defendant's ability to utilize the evidence at trial, and not the timing of the disclosure, that is determinative of prejudice.

Moreno v. Commonwealth, 10 Va. App. 408, 417, 392 S.E.2d 836, 842 (1990) (citations omitted). Thus, where the suppressed exculpatory evidence is provided to the defense during trial, the defendant must show "'that the failure to earlier disclose prejudiced him because it came so late that the information disclosed could not be effectively used at trial.'" Read v. Va. State Bar, 233 Va. 560, 564-65, 357 S.E.2d 544, 546-47 (1987) (emphasis omitted) (quoting United States v. Darwin, 757 F.2d 1193, 1201 (11th Cir. 1985)).

Here, the prosecutor provided the information regarding Jones to the defense only after appellant had concluded his direct examination. As we noted in Moreno:

The constitutional right to receive exculpatory evidence is not fulfilled, and a prosecutor's duty is not satisfied, simply by disclosure; timely disclosure is required. "This right guarantees an accused sufficient time to investigate and evaluate the evidence in preparation for trial." Where a defendant is forced, to his prejudice, to proceed ill prepared or in undue haste because of the prosecutor's untimely disclosure, his constitutional right is impaired, and his conviction must be reversed.

10 Va. App. at 417, 392 S.E.2d at 842 (citations omitted) (quoting Lomax v. Commonwealth, 228 Va. 168, 172, 319 S.E.2d 763, 765 (1984)). In this case, the prosecutor's belated disclosure denied appellant the opportunity to utilize the exculpatory evidence in his preparation for trial. Indeed, by the time the exculpatory evidence was disclosed, defense counsel had cross-examined several witnesses and appellant had already testified in his own defense, thus potentially compromising whatever alternative trial strategy the evidence might have suggested. We hold, therefore, that the prosecutor's belated disclosure of evidence that was probative of a theory that someone other than appellant had altered the checks in question prejudiced appellant and, thus, constituted a Brady violation.

- 13 -

Accordingly, the trial judge abused his discretion in denying appellant's motion for a

mistrial. Consequently, we reverse appellant's convictions and remand for a new trial, if the

Commonwealth be so advised.[3]

Reversed and remanded.

---

[3] "Because the case will be remanded and the evidence well may be presented differently upon a new trial, we will not give an advisory opinion regarding" appellant's remaining claims of error. Commonwealth v. Cary, 271 Va. 87, 102, 623 S.E.2d 906, 914 (2006).

> While we do not discount [appellant's] assertions on these issues and recognize that they may likely recur in the event of a new trial, it is also likely that the presentation of evidence will be sufficiently different that any expression by this Court as to the correctness of the rulings of the trial court in the former trial . . . would not be relevant and advisory only.

Id.