PRESENT: All the Justices

COMMONWEALTH OF VIRGINIA
                                          OPINION BY
   v.  Record No. 121177        JUSTICE ELIZABETH A. McCLANAHAN
                                         APRIL 18, 2013
WILLIAM EDWARD TUMA


                FROM THE COURT OF APPEALS OF VIRGINIA

     A jury convicted William Edward Tuma (Tuma) of taking

indecent liberties with a child, aggravated sexual battery,

and animate object penetration.  On appeal, we consider

whether the Commonwealth violated Brady v. Maryland, 373 U.S.

83 (1963) by suppressing evidence in the form of an audio tape

recording of an investigative interview with the victim.

Concluding the Commonwealth committed no Brady violation, as

the recording was made available to Tuma in sufficient time

for its use at trial, we will reverse the judgment of the

Court of Appeals of Virginia.

                I. RELEVANT FACTS AND PROCEEDINGS

     Under familiar principles, we review the facts in the

light most favorable to the Commonwealth, the prevailing party

at trial. Bly v. Commonwealth, 280 Va. 656, 658, 702 S.E.2d

120, 121 (2010) (applying the Brady rule).

     The victim, L.S., a seven-year-old girl, indicated to her

father and stepmother that she had been sexually assaulted by

Tuma, her stepfather.  L.S. stated that Tuma had been placing

his fingers "inside" of her "private parts," referring to her vagina. When provided with this information, the Dinwiddie County Sheriff's Office (DCSO), along with the Dinwiddie County Department of Social Services (DSS), conducted a joint investigation. Among other things, DCSO Investigator Dwayne Gilliam and Jon Scheid, a child protective services worker with DSS, interviewed L.S. Scheid audio tape recorded the interview as required by DSS regulations. See 22 VAC § 40-705-80(B)(1)).

As a result of the investigation, Tuma was indicted on charges of committing three sex crimes against L.S. for which he was ultimately convicted in a jury trial - taking indecent liberties with a child (Code § 18.2-370.1), aggravated sexual battery (Code § 18.2-67.3(A)(1)), and animate object penetration (Code § 18.2-67.2).

Prior to trial, the Commonwealth's Attorney for Dinwiddie County provided Tuma's counsel with a written summary of the investigative interview with L.S., which Gilliam prepared as part of his case report. Tuma's counsel was not provided pre-trial access to the tape recording of the interview. However, he learned of the tape's probable existence at least a week before trial when, according to him, he specifically "asked [Gilliam] whether or not there was a tape" and Gilliam said "he thought there may have been but he was not sure."

2

At trial, Gilliam, the Commonwealth's second of six witnesses (L.S. was the first), reiterated on cross-examination that he believed DSS had tape recorded the interview. Scheid, the Commonwealth's third witness, then confirmed during cross-examination that she recorded the interview and had the audio tape with her in the court room. Tuma's counsel immediately moved to admit the tape recording, in its entirety, into evidence. At that time, neither he, the prosecutor, nor the trial judge had listened to it. Under those circumstances, the trial judge refused to admit the tape into evidence. As the judge explained, "we'll not just play a tape . . . without any sort of thought or notion as to what is there."

In making this evidentiary ruling, the trial judge nevertheless made clear to defense counsel that he could listen to the tape: "You can go listen to it if you want to on your own time," the judge stated. "You can take it off and listen to it," the judge further clarified. The judge then asked the prosecutor if defense counsel "had access to [the tape]," to which the prosecutor replied, "He can listen to it if he wants to." Defense counsel did not ask to listen to the tape outside of the jury's presence, either then or at any other time during the trial. Rather, he simply asked the

3

judge to "[j]ust note [his] exception" to the ruling on his request to play the entire tape to the jury.

Tuma's counsel moved a second time to admit the tape into evidence before arguing a motion to strike at the conclusion of the Commonwealth's case.  He asserted that the tape was "the best evidence of what was said" during the interview, and that he "would think that it would be exculpatory in terms of where things occurred and [the] number of times they occurred," referring to the allegations of sexual assault. However, Tuma's counsel admittedly had "not heard [the tape] yet."  The trial judge denied the request, explaining to him, "I don't think you are entitled just to play something because you think it may be exculpatory."

Tuma's counsel first listened to the tape after the trial ended with guilty verdicts on all charges.  Tuma subsequently filed motions to strike the evidence as insufficient for conviction and, alternatively, to set aside the verdicts and grant him a new trial, based on the contention that the prosecutor violated Brady by failing to provide pre-trial access to the tape.  Had he been given such access, Tuma argued, it could have been used to impeach the credibility of the Commonwealth's first four witnesses, namely, L.S., Gilliam, Scheid, and L.S.'s counselor, Amy Holloman. According to Tuma, the tape revealed eight certain "areas of

4

interest and factual discrepancies" that the defense could have used to effectively cross-examine those four witnesses. Tuma's counsel conceded at an earlier post-trial hearing, however, that he had access to the tape during the trial. Counsel specifically admitted that "at the trial [the prosecutor] said I could have access to it and things of that nature." He similarly acknowledged that the trial judge "was clear at the trial that I would be able to get it and listen to it." Finding no Brady violation, the trial court denied Tuma's motions, entered a judgment of conviction and imposed the sentences fixed by the jury.

Tuma appealed his convictions to the Court of Appeals, contending the trial court erred by (i) rejecting his Brady challenge to the prosecutor's failure to disclose the audio tape prior to trial, and (ii) refusing to admit the tape into evidence and allow the jury to hear it. In a memorandum opinion, a three judge panel, with one judge dissenting, reversed the convictions on the Brady issue and remanded the case for a new trial. Tuma v. Commonwealth, Record No. 0919-10-2, 2011 Va. App. LEXIS 337 (November 8, 2011). Given that ruling, the panel did not rule on Tuma's second assignment of error. Id. at *12-13. Granting the Commonwealth's petition for rehearing en banc, the Court of Appeals reached the same

5

decision. <u>Tuma v. Commonwealth</u>, 60 Va. App. 273, 303-04, 726 S.E.2d 365, 380 (Va. App. 2012).

We granted the Commonwealth this appeal on two assignments of error in which it asserts the Court of Appeals erred by (i) finding a <u>Brady</u> violation when the evidence was available to Tuma at trial; and (ii) holding that the audio tape contained evidence that was material under <u>Brady</u>.

## II. ANALYSIS

### A.

Under the <u>Brady</u> rule, the prosecution's suppression of evidence favorable to the accused and material to either guilt or punishment violates due process. <u>Brady</u>, 373 U.S. at 87. First, the prosecution's suppression of evidence may be established "irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> Second, the evidence must be "'favorable to the accused, either because it is exculpatory, or because it is impeaching.'" <u>Skinner v. Switzer</u>, 562 U.S. ___, 131 S. Ct. 1289, 1300 (2011) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)). Third, the "'evidence is "material" within the meaning of <u>Brady</u> when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" <u>Smith v. Cain</u>, 565 U.S. ___, 132 S. Ct. 627, 630 (2012) (quoting <u>Cone v. Bell</u>, 556 U.S. 449, 469-70 (2009)). The

6

accused has the burden of establishing each of these three components to prevail on a Brady claim.  Skinner, 131 S. Ct. at 1300.

     In this appeal, the Commonwealth does not challenge whether the tape recording presented favorable impeachment evidence for the defense, as Tuma contends.  The Commonwealth instead limits its challenge to Tuma's showing on the suppression and materiality prongs of the Brady rule.  Because we agree with the Commonwealth that the prosecution did not suppress the tape in violation of Brady, we need not address the issue of materiality.  See Porter v. Warden of the Sussex I State Prison, 283 Va. 326, 332, 722 S.E.2d 534, 542 (2012) (explaining that "we do not reach the issue of materiality" under Brady "unless we first determine that the evidence was not available" to the defense).

B.

     Brady is "a disclosure rule, not a discovery rule." United States v. Higgins, 75 F.3d 332, 335 (7th Cir. 1996). Indeed, "[t]here is no general constitutional right to discovery in a criminal case, and Brady did not create one." Weatherford v. Bursey, 429 U.S. 545, 559 (1977).  The more limited purpose of the Brady rule is "'to assure that [the defendant] will not be denied access to exculpatory [or impeachment] evidence known to the government but unknown to

7

him.'"  Lugo v. Munoz, 682 F.2d 7, 10 (1st Cir. 1982) (quoting United States v. Ruggiero, 472 F.2d 599, 604 (2d Cir. 1973)) (first emphasis added).  Accordingly, Brady is not violated, as a matter of law, when impeachment evidence is made "'available to [a] defendant[] during trial'" if the defendant has "sufficient time to make use of [it] at trial."  Read v. Virginia State Bar, 233 Va. 560, 564-65, 357 S.E.2d 544, 546-47 (1987) (quoting U.S. v. Behrens, 689 F.2d 154, 158 (10th Cir. 1982)); see Higgins, 75 F.3d at 335 (Under Brady, "[d]isclosure even in mid-trial suffices if time remains for the defendant to make effective use of the exculpatory material."); United States v. Knight, 867 F.2d 1285, 1289 (1989) (holding Brady satisfied where "[a]ppellants received the information during the trial and have failed to demonstrate that the disclosure came so late that it could not be effectively used"); see generally 6 Wayne R. LaFave, Criminal Procedure § 24.3(b) at 365 (3d ed. 2007) (Under Brady, "the prosecution should be able to satisfy its constitutional obligation by disclosure at trial.").

This principle applies without regard to when the prosecution was or should have been "aware of the information."  Read, 233 at 564, 357 S.E.2d at 546, citing with approval United States v. Darwin, 757 F.2d 1193 (11th Cir. 1985).  In Darwin, the defendant contended that the

8

prosecution violated <u>Brady</u> because the government failed to disclose certain impeachment evidence about a witness until after he had testified even though the government had been aware of the information several days prior to his testimony. <u>Id.</u> at 1201. Rejecting defendant's <u>Brady</u> claim, the Court of Appeals for the Eleventh Circuit explained:

> The point in the trial when a disclosure is made . . . is not in itself determinative of timeliness. We agree with those circuits holding that a defendant must show that the failure to earlier disclose prejudiced him because it came so late that the information disclosed could not be effectively used at trial. Appellant here made no such showing. In fact, although Dunn had completed his testimony, the trial itself was far from over. Appellant could have recalled Dunn for further questioning but chose not to.

<u>Id.</u> (internal citations omitted), quoted in part by <u>Read</u>, 233 Va. at 564-65, 357 S.E.2d at 546-47; <u>see also</u> <u>United States v. Davis</u>, 306 F.3d 398, 421 (6th Cir. 2002) (holding disclosure of impeachment material during trial, when witnesses were subject to recall, satisfied <u>Brady</u>); <u>United States v. Mangual-Garcia</u>, 505 F.3d 1, 5-6 (1st Cir. 2007) (same); <u>United States v. Kime</u>, 99 F.3d 870, 882 (8th Cir. 1996) (same).

In <u>Read</u>, this Court further relied upon <u>United States v. Elmore</u>, 423 F.2d 775 (4th Cir. 1970), which held that no <u>Brady</u> violation occurred when the impeachment information was disclosed "well before the end of the trial," particularly

9

given that defense counsel requested no continuance "for whatever further time might have been necessary" to make use of the information at trial. Id. at 779-80. Similarly rejecting a claim for late disclosure of Brady material, the Court of Appeals for the Seventh Circuit in Higgins reasoned that "[i]f counsel needed more time, she had only to ask; yet she did not seek a continuance. Nothing more need be said." 75 F.3d at 335; see United States v. Crayton, 357 F.3d 560, 569 (6th Cir. 2004) ("Any disadvantage that a defendant might suffer because of the tardiness [in the disclosure] of impeachment material can be cured by asking for a recess." (citing United States v. Presser, 844 F.2d 1275, 1283-84 (6th Cir. 1988)).[1] In the analogous context of Rule 3A:11, governing discovery in criminal cases, this Court has held that a defendant who "failed to move for a continuance or even for a recess in order to consider the material" untimely disclosed by the prosecution would not "be heard to complain that he had insufficient time to prepare for trial." Frye v. Commonwealth, 231 Va. 370, 384, 345 S.E.2d 267, 277 (1986);

---

[1] See also United States v. Collins, 415 F.3d 304, 311 (4th Cir. 2005) (holding that the proper response to a late Brady disclosure was a motion for continuance, not a motion to dismiss); United States v. Sepulveda, 15 F.3d 1161, 1178 (1st Cir. 1993) (generally "a defendant who does not request a continuance will not be heard to complain on appeal that he suffered prejudice as a result of late arriving" Brady material).

10

see Davis v. Commonwealth, 230 Va. 201, 204, 335 S.E.2d 375, 377 (1985) (holding no prejudice shown under Rule 3A:11 when defendant "did not request either a postponement or a continuance").

Here, Tuma did not have pre-trial access to the audio tape recording of the investigative interview with L.S., which purportedly contained impeaching material favorable to him. His counsel, however, had reason to believe before trial that the tape existed based on his conversation with Gilliam. Then early in the trial, the two prosecution witnesses who conducted the interview, Gilliam and Scheid, testified that it was recorded; and Scheid revealed that the tape was in her possession in the courtroom. Without first seeking to listen to the tape outside the jury's presence, Tuma's counsel simply moved to admit the tape into evidence and play it for the jury, which the trial judge denied as procedurally improper. Nevertheless, the judge twice advised defense counsel that he could "go listen to it," and the prosecutor concurred, stating, "[h]e can listen to it if he wants to."

On these facts, we conclude Tuma failed, as a matter of law, to show he was denied access to the tape recording in sufficient time to effectively use it at trial. Upon learning during Scheid's testimony that she had the tape, Tuma's counsel could have asked for a recess and listened to it,

proceeded to cross-examine Scheid using any favorable impeaching information contained on it, and recalled L.S. and Gilliam for the same purpose; but defense counsel chose not to do so.

Despite such access to the tape at trial, Tuma attempts to save his Brady claim by pointing to the subsequent exchange between the trial judge, his counsel, and the prosecutor following the close of the Commonwealth's case.  At that time, Tuma's counsel moved for the second time to admit the tape into evidence without having listened to it, and without having made any request during the trial to do so.  He instead asserted that the tape was "the best evidence of what was said" during the recorded interview, and that he "would think . . . it would be exculpatory in terms of where [the alleged sexual assaults] occurred and [the] number of times they occurred."  The trial judge again denied the request, explaining that Tuma's counsel was not "entitled just to play something" because he thought "it may be exculpatory."  When Tuma's counsel pursued the issue further, the trial judge reiterated his ruling that "[t]he tape will not be played."  The trial judge committed no error under Brady with this ruling.  The trial judge was not denying Tuma access to the tape, as Tuma contends, but rather rejecting the method by which his counsel sought repeatedly to introduce the tape into

12

evidence (an issue to be addressed by the Court of Appeals on remand, as explained in Part II.C. of this opinion). We thus reject Tuma's argument that the ruling was in error under Brady because it was not a Brady ruling.

Tuma also asserts that the prosecutor violated Brady during the same exchange because she represented there was no exculpatory information on the tape. What she actually represented was that she had "relied" on information from Investigator Gilliam to form her opinion that nothing on the tape was exculpatory. Most significantly, when the trial judge asked her at that time whether she had listened to the tape and whether she knew if it was exculpatory, she answered unequivocally, "[n]o, sir." Tuma thus cannot credibly contend that the prosecutor's representations about the tape somehow amounted to its suppression. Indeed, Tuma's counsel made clear each time he moved to introduce the tape into evidence that he had formed his own opinion that it contained favorable impeachment material based on the testimony of L.S., Gilliam and Scheid – yet he did not pursue the opportunity to listen to it when it was made available to him early in the trial. In short, the tape was not suppressed. Thus, having had such access to the tape, Tuma "cannot miraculously resuscitate [his] defense after conviction by invoking Brady." United States v. White, 970 F.2d 328, 337 (7th Cir. 1992).

Finally, we disagree that "the futility of any request Tuma might have made at trial for a recess to listen to the audio tape is obvious." Tuma, 60 Va. App. at 303, 726 S.E.2d at 380. As Judge Kelsey states in his dissenting opinion:

> This ipse dixit implies a bold accusation. The majority apparently believes it "obvious" the trial judge would have arbitrarily denied a brief recess (if one had been requested) for Tuma's counsel to listen to the tape - after twice suggesting that he do so. Nothing in the record suggests this censorious supposition is true, much less obvious. We will never truly know, of course, because Tuma's counsel never asked for a brief recess to listen to the tape. I do not see how the trial judge can be blamed for that.

Id. at 313-14, 726 S.E.2d at 385.[2]

---

[2] We also note the Court of Appeals devotes much of its opinion to criticizing the prosecutor's handling of the tape on the basis of essentially ethical considerations. In Brady, however, the United States Supreme Court made clear that the "good faith or bad faith of the prosecution" is not dispositive in deciding a Brady claim. Brady, 373 U.S. at 87. As the Court explained more recently in Strickler, "under Brady an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment. 'If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.'" 527 U.S. at 288 (quoting United States v. Agurs, 427 U.S. 97, 110 (1976)). In short, "Brady is not a canon of prosecutorial ethics . . . . In Brady cases, therefore, an appellate court sits not as a disciplinary committee of the state bar – but rather as a court of review, ensuring only that the criminal conviction satisfies the threshold requirements of due process." Tuma, 60 Va. App. at 308-09, 726 S.E.2d at 382-83 (Kelsey, J., dissenting). Because of the availability of the audio tape for Tuma's use at trial, those threshold requirements were met under Brady in this case.

14

C.

This appeal is limited to the Commonwealth's challenge to the Court of Appeals' decision on the Brady issue, which that court decided in Tuma's favor pursuant to his first assignment of error. In light of that decision, the Court of Appeals was not required to address Tuma's second assignment of error in which he challenged the trial court's denial of his request to admit the tape into evidence (a separate issue from whether the prosecution violated Brady). That evidentiary ruling is thus not before this Court to decide. Therefore, having now decided in the Commonwealth's favor on the Brady issue, we will remand this case to the Court of Appeals to decide Tuma's second assignment of error.

### III. CONCLUSION

For these reasons, we will reverse the judgment appealed from and remand the case to the Court of Appeals for a decision on Tuma's second assignment of error challenging the trial court's ruling on the admissibility of the audio tape of the investigative interview with the victim.

Reversed and remanded.


JUSTICE LEMONS, concurring.

I agree with the majority's holding that the recording was made available to Tuma in sufficient time

15

for its use at trial, but I write separately to address the issue of materiality raised by the dissent.

The United States Supreme Court held in Brady v. Maryland, 373 U.S. 83 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. That Court later explained that evidence is only material under Brady "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." Id.

We have held that in order to meet the materiality prong, "the accused must have been prejudiced." Workman v. Commonwealth, 272 Va. 633, 644-45, 636 S.E.2d 368, 374 (2006). Essentially, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). "The mere possibility

16

that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." United States v. Agurs, 427 U.S. 97, 109-10 (1976).

The dissent fairly points out the prosecutor's failures in this case, and I agree that the prosecutor's understanding of her duties under Brady was deficient. However, the ultimate issue under Brady is whether the defendant has actually been prejudiced, not what a prosecutor should or should not have done in a particular case. Under the facts of this case, I do not believe that Tuma was prejudiced.

The inconsistencies between L.S.'s statements on the tape and her statements at trial involve where the abuse occurred and how many times it occurred. On the tape, L.S. stated that the abuse only occurred at the "white house," and that it happened more than five times and less than ten times. At trial, L.S. testified that the abuse occurred in other locations in addition to the "white house,"* and more than ten times. But the statements on the tape never indicate that L.S. was not abused, or that

---

* The "white house" is also referred to as the "house with horses" and is located in Dinwiddie County.

17

Tuma was not the person who abused her.  In Smith v. Cain, 565 U.S. __, 132 S.Ct. 627 (2012), the United States Supreme Court held that previously undisclosed impeachment evidence was material.  However, the evidence in Smith was material because it directly contradicted the only eyewitness' identification of the defendant.  Id. at 630. Because the statements on the tape in no way indicate that L.S. was not abused, or that someone else was the abuser, the United States Supreme Court's holding in Smith v. Cain is not implicated.

L.S. was consistent in her statements on the tape and in her trial testimony that Tuma abused her at least 5-10 times at the "white house."  Tuma was only charged with and convicted of three counts: taking indecent liberties with a child, aggravated sexual battery, and animate object sexual penetration.  Perhaps if Tuma had been charged with more than five counts, then the exact number of times the abuse occurred would become material.

The jury in this case was also already aware that L.S. had made inconsistent statements as to the number of times the abuse occurred and the locations where the abuse occurred.  The trial testimony of Jon Webster Scheid, the social services worker, and Investigator Gilliam, the police officer who conducted the taped interview, and

18

Investigator Gilliam's written summary of that interview, already demonstrated that L.S.'s trial testimony differed from her initial interview with them regarding the frequency and location of the abuse, and her mother's presence during the abuse. The audio tape was merely cumulative of other evidence that had already been used to impeach L.S. at trial. Where undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has been attacked, the undisclosed evidence may be cumulative, and hence not material. See Byrd v. Collins, 209 F.3d 486, 518 (6th Cir. 2000); United States v. Avellino, 136 F.3d 249, 257 (2d Cir. 1998); United States v. Cuffie, 80 F.3d 514, 518 (D.C. Cir. 1996).

The impeachment value of the statements on the tape would have been minimal, especially in light of the expert witness' testimony that it is not uncommon for young children to not recall specific dates or instances of abuse because they attempt to repress such events. Any impeachment of these issues, taken as a whole, does not undermine the confidence in this verdict.

The dissent asserts that the impeachment evidence was also material to the punishment Tuma received, noting that Tuma received a sentence of 35 years' imprisonment, nearly

19

three times the upper end of the guidelines.  The mere fact that the jury sentenced Tuma above the guidelines does not prove materiality.  As discussed above, the jury was already aware of L.S.'s inconsistent statements. Despite that, the jury believed her testimony and the evidence was more than sufficient to prove that Tuma sexually molested his seven-year-old stepdaughter.  The jury's sentence was within the statutory range and arguably supported by the egregious facts of this case, including the victim's very young age.

Any Brady claim must be "evaluated in the context of the entire record" of the case.  Agurs, 427 U.S. at 112. Favorable evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  Bagley, 473 U.S. at 682.  After considering the entire record of the case and the statements on the audio tape, I believe that the statements on the tape do not "put the whole case in such a different light as to undermine confidence in the verdict."  Kyles, 514 U.S. at 435. I also believe that Tuma has failed to establish a reasonable probability that his punishment would have been

20

different if L.S.'s statements on the audio tape had been utilized by the defense at trial.  Tuma has failed to prove that the statements on the audio tape were material to his guilt or punishment.

Accordingly, I join the majority opinion and would further hold that the statements at issue were not material.


JUSTICE MILLETTE, with whom JUSTICE GOODWYN joins, dissenting.

The fundamental principle set forth in Brady v. Maryland, 373 U.S. 83, 87 (1963), is that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  To be awarded a retrial based on a Brady violation, the defendant must make three showings as set forth in Skinner v. Switzer, 562 U.S. ___, 131 S. Ct. 1289 (2011):  "(1) the evidence at issue is favorable to the accused, either because it was exculpatory, or because it is impeaching (2) the State suppressed the evidence, either willfully or inadvertently and (3) prejudice . . . ensued."  Id. at 1300 (alteration in original) (internal quotation marks omitted).  Because

I find that the defendant in this instance made all of the above showings, I respectfully dissent.

1. Undisclosed evidence is favorable to the accused because it is impeaching.

As to the first prong, the Commonwealth does not contest on appeal that we are considering impeachment evidence, and it is clear that we are. The victim was the primary witness against the accused, and the content of the tape when compared to the in-court statements of the victim raised inconsistencies primarily as to the number of times the alleged abuse occurred and the locations where she was allegedly abused. The content of the tape would thus have allowed for impeachment through a more thorough cross-examination of the witnesses, arguably raising doubts in the jurors' minds as to either the truthfulness of the victim's statements or the frequency or severity of the events that occurred.

2. Impeachment evidence was suppressed.

The second prong is where the majority finds a deficiency in this case. The majority focuses on the availability of the tape at trial, holding that there was no suppression because the evidence was made available during trial but that the defense attorney declined to take advantage of it. The majority concludes that the

burden fell on the defense attorney to ask for a continuance to review the tape, and, finding that the tape was made available to him at trial but that he did not make such a request, holds that there was no Brady violation.

I disagree with the majority's conclusion that the tape was made available at trial in the form of disclosed exculpatory evidence. A close reading of the trial transcript seems to reveal the opposite.

During trial, L.S., the first witness, testified that she was abused in both her stepfather's and her own bedroom within the original house where they lived (the "house with the horses"), as well as in the trailer park and her grandmother's house after they moved out of the original house. She also testified that her stepfather touched her "a lot" – more than ten times – and that when they moved into the trailer he touched her three times a week, every week. She additionally stated that her stepfather made her touch her younger brother while he was in the bathtub.

After the detective and the Department of Social Services (DSS) worker testified, it first became clear that the DSS worker had a tape of the original interview with the girl. Defense counsel moved to play the tape

arguing that it was admissible under the "best evidence" rule. Over defense counsel's objection, the circuit court denied the motion as to admissibility as best evidence, stating: "We'll not play it now because you want to play it. It is not admissible unless it contradicts something that she has said. You haven't heard it. . . . It is not going to be played." When asked by the circuit court whether defense counsel had had access to the tape, the prosecutor, who previously had not provided the tape to defense counsel, had not listened to the tape, and had instead produced for the defense a report of the interview prepared by the detective, responded that defense counsel "can listen to it if he wants to." There was no discussion by the circuit court or admission by the prosecutor at that time regarding whether the tape was potentially exculpatory.

It was not until the motion to strike at the close of the Commonwealth's evidence that the issue of the potential exculpatory nature of the tape was raised, when counsel for the defense argued that the tape "would be exculpatory in terms of where things occurred and a [sic] number of times they occurred." The following exchange continued:

| | |
|---|---|
| The Court [to the Commonwealth]: | Have you listened to the tape? |
| [The Commonwealth]: | No, sir. |
| The Court: | So you don't know whether it is exculpatory or not? |
| [The Commonwealth]: | No, sir. |
| The Court: | So therefore you didn't give it to him as being exculpatory because you never listened to it? You don't think it is – he is entitled to it because it is not exculpatory? You just don't know? |
| [The Commonwealth]: | I relied on my investigator who had given me his notes and transformed that into a typewritten statement that codified what went on at that particular interview. |
| The Court: | So you are satisfied there is nothing significant or exculpatory? Are you willing to stand on that? If it is you will not have complied with Brady. |
| [The Commonwealth]: | Yes, sir. |
| The Court: | You are willing to stand on that? |
| [The Commonwealth]: | Yes, sir. |
| | . . . . |
| The Court: | You are saying that you think it is exculpatory? |
| [Defense counsel]: | Yes, sir. |

25

The Court:          In some way?

[Defense counsel]:  Yes, I mean I can't get to
                    the material.  I have asked
                    the representatives.

The Court:          Well, I don't think you are
                    entitled just to play
                    something because you think
                    it may be exculpatory. . . .
                    The Court is not going to
                    admit it.  If at some point
                    if your client is convicted
                    that tape shows something
                    that is significant,
                    exculpatory, he gets a new
                    trial.  So that is the way
                    we are going with it.

                              . . . .

                    We will not hear any more
                    about that     over your
                    objection.  The tape will
                    not be played.  Now you have
                    a motion to strike, and I
                    will be glad to hear you on
                    that.

The above exchange reflects the clear suppression of the evidence at trial.  The tape was not made available to the defendant when he requested it, and the prosecutor conceded her duty to disclose potentially exculpatory evidence on the tape and acknowledged that she was not doing so at her own peril.  The circuit court stated that it would hear no additional argument on the issue.  The information was therefore not made available to the defendant at a time when it could be used.

According to the majority, this case rises or falls on the apparent availability of the tape at trial and the failure of defense counsel to immediately request a continuance to listen to the tape once it was established that the tape was in the courtroom.  The majority, in concluding that this failure of defense counsel is paramount, ignores the fact that the burden of production of exculpatory evidence falls on the prosecution.  The duty to disclose exculpatory evidence requires not merely a duty to <u>acknowledge</u> the existence of a tape of an interview, but rather to <u>disclose</u> the exculpatory or impeachment evidence at least during the course of a trial, if not earlier.  The Supreme Court of the United States has stated that

> [a] rule thus declaring "prosecutor may hide, defendant must seek" is not tenable in a system constitutionally bound to accord defendants due process.  Ordinarily, we presume that public officials have properly discharged their official duties.  We have several times underscored the special role played by the American prosecutor in the search for truth in criminal trials.  Courts, litigants, and juries properly anticipate that obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed.

<u>Banks v. Dretke</u>, 540 U.S. 668, 696 (2004) (internal quotation marks and citations omitted) (second, third, and fourth alterations in original).  Our courts have long

stated that we hold our prosecutors to a higher standard even than other attorneys:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.

Berger v. United States, 295 U.S. 78, 88 (1935).  Thus, relying on the declarations by the prosecutor that the content of the tape was not exculpatory, the circuit court did not order the production of the evidence.  In fact, again in reliance on the prosecutor's position, the circuit court foreclosed any further inquiry.

The prosecutor's overly narrow view of exculpatory evidence was only revealed during argument on a post-trial motion brought by defense counsel more than three months after the trial was concluded, when defense counsel was still seeking an opportunity to inspect the tape.  Defense counsel argued to the circuit court that "in light of what has gone on[,] there needs to be some sort of inspection of the tape to see if it has Brady material. . . .  I don't think it's sufficient for a prosecutor to say, well, the police officer told me there was nothing exculpatory

28

on it."  The prosecutor responded that "[t]he only thing that would be exculpatory on that tape is if there was [a] child saying he didn't do it, somebody else did it or it happened in China or somewhere else."

Assuming without deciding that the evidence contained in the tape only became exculpatory once the victim testified, the prosecutor felt no obligation to turn over evidence that the Commonwealth does not now contest should have been disclosed under Brady.  The prosecutor apparently ignored the mandate of Brady to disclose evidence favorable to the accused either because it is exculpatory or because it is impeaching.  Skinner, 131 S. Ct. at 1300.

Defense counsel, meanwhile, clearly signaled that he was seeking impeachment evidence when he claimed during trial that he was seeking evidence regarding each witness' credibility based upon discrepancies in the number and location of occurrences.  In a post-trial motion to set aside the verdict, defense counsel was even more specific in addressing what he considered to be eight separate areas of discrepancies that he believed could have been utilized in impeaching witnesses' credibility if he could only have had access to the tape.

3.  Defendant suffered material prejudice.

29

Because of its finding as to the second prong, today's majority does not reach the third prong of materiality or prejudice.  Under Brady, the prosecution's suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment."  Brady, 373 U.S. at 87 (emphasis added).  This has been more recently phrased as the defendant's obligation to prove prejudice by showing a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  Cone v. Bell, 556 U.S. 449, 469-70 (2009).  "A reasonable probability does not mean that the defense 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough 'to undermine[] confidence in the outcome of the trial.'"  Smith v. Cain, 565 U.S. ___, 132 S. Ct. 627, 630 (2012) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

Considering the materiality of the impeachment evidence, I concur with the majority opinion offered by the Court of Appeals of Virginia that, given that the Commonwealth's case rested primarily on the victim's testimony, impeachment testimony concerning the number of instances of abuse and the places where the abuse occurred

30

could have sufficiently undermined the jury's confidence in the victim as a witness to create a reasonable probability that the outcome of the proceeding, potentially as to guilt but at least as to sentencing, would have been different.  Witness credibility is of the utmost importance in a case like this one in the absence of any physical evidence produced by the Commonwealth. The accusations in the case at bar were such that they relied primarily on the credibility of a single witness, one who is young and thus suggestible, on the detective and DSS worker's accounts of her prior statements, and on her counselor's observations.  See, e.g., Workman v. Commonwealth, 272 Va. 633, 650, 636 S.E.2d 368, 378 (2006) (noting that the credibility of a key witness testifying against a defendant is "a significant issue at trial," and that – for Brady purposes – material usable for impeachment is "critical . . . evidence" in that context). The case at bar required the jury to weigh these statements against the testimony of the defendant and the victim's mother, who denied the abuse.  Under such circumstances, impeachment evidence goes directly to the jury's evaluation of which witnesses are being truthful, and so bears strongly not only on the issue of guilt, but, since a jury in Virginia also imposes the punishment for

31

felony convictions, likewise bears on the issue of punishment.

At sentencing before the circuit court judge, defense counsel argued that the sentencing guidelines for the crimes for which the defendant was convicted ranged from a total of five years, two months to thirteen years, one month. At trial, the jury had reached a determination that the combined sentence for the three convictions should be 35 years, nearly three times the upper end of the guidelines. The circuit court refused any reduction in the sentence, specifically deferring to that jury verdict. See Code § 19.2-298.01(A) ("In cases tried by a jury, the jury shall not be presented any information regarding sentencing guidelines.")

Given the severity of the punishment and the potential for impeachment of the witnesses, the likelihood of a different result, at least as to sentencing, is sufficient to undermine confidence in the outcome of the proceeding. As explained by Judge Humphreys, writing for the majority of the Court of Appeals:

> Had the jury known of L.S.'s recorded interview statements, that the abuse occurred only at the white house between five and ten times and not at the trailer or her grandmother's house, the jury very well could have doubted the number of times Tuma sexually abused L.S., considering that her interview statements contradicted her

32

> trial testimony. It is reasonable to conclude that the evidence of repeated occurrences of sexual abuse at three separate locations impacted the jury's assessment of a proper punishment for Tuma. . . . Therefore, the evidence was also material to Tuma's degree of punishment, and suppression of the recorded interview constituted a separate Brady violation on that basis.

A jury could reasonably have awarded a lengthier sentence based on the more frequent abuse testified to at trial. In addition, the tape only referred to abuse in Tuma's bedroom at one house in which they lived, unlike L.S.'s testimony at trial which made references to him coming into her bedroom on multiple occasions and continuing to abuse her as they moved their residence to multiple locations, which a jury could have found more reprehensible. There was also a discrepancy between the victim's testimony at trial and on the tape as to her mother's involvement in the alleged abuse, which may have had a dual impact on the credibility of the mother and the jury's determination of the appropriate punishment. Finally, the tape contained no references involving Tuma demanding she touch her younger brother in the bathtub, as testified to at trial, and which could reasonably be viewed as more significantly offensive behavior on the part of her stepfather. Thus, even if Tuma would ultimately have been found to be guilty of the abuse, due

33

process entitled him to use these contradictions to attempt to mitigate the sentence levied upon him by the jury.

For the aforementioned reasons, I would affirm the <u>en banc</u> judgment of the Court of Appeals of Virginia reversing the conviction and remanding for retrial as to both guilt and sentencing.